## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **THOMAS E. PEREZ, Secretary of Labor,** | ) | |
| **United States Department of Labor** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 12-CV-588-JED-PJC** |
| | ) | |
| **EL TEQUILA, LLC, and** | ) | |
| **CARLOS AGUIRRE, Individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Before the Court is the United States Secretary of Labor's Motion for Summary Judgment (Doc. 190, 191). The Secretary claims that the defendants willfully violated the Fair Labor Standards Act's recordkeeping, overtime, and minimum wage provisions, and as a result are liable for $2,225,392.62, half of which is back pay and half liquidated damages. The Secretary argues that the undisputed material facts entitle him to an order granting summary judgment and enjoining future violations of the Act. For the reasons set forth below, the Motion is granted in part.

## I.     Background

The United States Secretary of Labor (the "Secretary") brings this action pursuant to the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201-262. The Secretary alleges that defendants (1) have failed to pay employees the statutory minimum wage, (2) have failed to pay employees for hours worked in excess of 40 hours per week, and (3) have failed to maintain required records of employees' wages and hours. (Doc. 165 at 4-5). The Secretary seeks judgment for unpaid wages, an equal sum as liquidated damages, and an order enjoining

defendants from committing future FLSA violations.  (Doc. 191 at 1).  Unless specifically noted, the following facts are undisputed.

Defendant Carlos Aguirre controls the operations of defendant El Tequila, LLC (jointly the "defendants"), and through it operates four Mexican-style restaurants in and around Tulsa, Oklahoma.  On December 21, 2010, as a result of an employee complaint, the United States Department of Labor (the "DOL"), through its Wage and Hour Division, began to investigate one of the defendants' restaurants, located at 5001 S. Harvard Avenue, Tulsa, OK 74135 (the "First Harvard Investigation").  As a part of the First Harvard Investigation, Aguirre provided Wage Hour Inspector ("WHI") Ybelka Saint-Hilaire with payroll summary sheets that he would later admit did not accurately reflect payments made to his employees.  When Saint-Hilaire closed the First Harvard Investigation on March 23, 2011, she made a finding of recordkeeping violations only.

Three months later, on June 29, 2011, Saint-Hilaire began a second investigation of the Harvard restaurant (the "Second Harvard Investigation").  As a result of the second investigation, Saint-Hilaire determined that, from December 5, 2009, to August 6, 2011, the defendants paid their Harvard location employees a fixed weekly salary, rather than an hourly wage, in violation of the minimum wage and overtime provisions of the FLSA.  The defendants settled the Second Harvard Investigation by agreeing to future compliance with the FLSA and to pay wages owed to their Harvard employees for the December 5, 2009, to August 6, 2011, period (the "Harvard Settlement").  Although the defendants made installment payments, Aguirre has since admitted that a number of his employees cashed their checks and returned the money to him.

After the defendants agreed to settle the Second Harvard Investigation, Saint-Hilaire met with the defendants to obtain time and pay records for the defendants' three other restaurants. The defendants have admitted that employees at all four of their restaurants performed the same types of work, worked the same hours, were paid the same way, and that records were maintained in the same manner.  As part of the investigation of the three remaining restaurants, the defendants provided Saint-Hilaire with handwritten timesheets purporting to record the hours employees started and ended work each day.

On November 11, 2011, the defendants hired counsel for the first time.  According to the defendants, they had understood the Harvard Settlement to account for violations at all four restaurants and, alarmed to learn they might owe still more money, they retained counsel.  The parties were unable to reach a settlement regarding the three remaining restaurants.

In an apparent effort to bring their restaurants into compliance with the FLSA, the defendants replaced the handwritten timesheets with Casio QT 6600 register machines, which record electronically time worked by the defendants' employees.  The time reports produced by the machines can be altered, and the defendants, by failing to respond to allegations in the Secretary's Third Amended Complaint, have admitted that they altered these reports to reduce the number of worked hours recorded.

On October 22, 2012, the Secretary filed suit against the defendants, alleging willful violations of the FLSA beginning in October 2009.

## II.     Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In considering a summary judgment motion, courts determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 at 251-52.  The evidence of the nonmovant is to be taken as true, and all justifiable inferences are to be drawn in the nonmovant's favor.  *Anderson*, 477 U.S. at 255; *see also Ribeau v. Katt*, 681 F.3d 1190, 1194 (10th Cir. 2012).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment. . . ." *Anderson*, 477 U.S. at 255.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

"When the moving party has carried its burden under Rule 56[a], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted).  When the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* (quotations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. *Garratt v. Walker*, 164 F.3d 1249, 1251 (10th Cir. 1998).

### a.  Minimum Wage, Overtime, and Recordkeeping Violations

Congress designed the FLSA to prohibit "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of

workers." 29 U.S.C. § 202(a).  The FLSA seeks to meet this goal in part by setting forth wage, hour, and overtime standards.  *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1333 (2011).

Covered employers must pay their employees a minimum wage provided by the FLSA, 29 U.S.C. § 206, and overtime pay for work in excess of forty hours a week, 29 U.S.C. § 207. "The purpose of FLSA overtime is 'to compensate those who labored in excess of the statutory maximum number of hours for the wear and tear of extra work and to spread employment through inducing employers to shorten hours because of the pressure of extra cost.'"  *Chavez v. City of Albuquerque*, 630 F.3d 1300, 1304 (10th Cir. 2011) (quoting *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 460 (1948)).  The FLSA requires employers to compensate employees for overtime hours "at a rate not less than one and one-half times the regular rate at which [the employee] is employed."  29 U.S.C. § 207(a)(1).  In order to facilitate compliance with and enforcement of the requirements of the Act, the FLSA requires a covered employer to keep records "of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him."  29 U.S.C. § 211(c).

In their Response to the Secretary's summary judgment motion, the defendants argue that their violations of the FLSA were not willful, that the Secretary has miscalculated the amount of back pay owed by the defendants, that liquidated damages should not be awarded, and that an injunction is not warranted.  (Doc. 213 at 8-20).  The defendants do not contest the Secretary's claims that they are "employers" under the FLSA or that they violated the FLSA's minimum wage, overtime, and recordkeeping provisions.[1]

---

[1] The defendants state that "the employees were paid for hours worked" and that "Carlos Aguirre believed that employees were being paid according to the job he or she had and the amount of time he or she worked."  (Doc. 213 at 5).  Significantly, the defendants do not challenge the

Once a party moving for summary judgment has met its initial burden, the party resisting the motion cannot rest on its pleadings. *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992) (citing *Security National Bank v. Belleville Livestock Commission*, 619 F.2d 840, 848 (10th Cir. 1979)).  Rather, the party opposing summary judgment bears the burden of informing a court of the reasons, legal or factual, why summary judgment should not be entered.  The Court's local rule governing summary judgment procedure, LCvR56.1, provides in subpart (c) that "[a]ll material facts set forth in the statement of the material facts of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party."  Although a district court may, in its discretion, go beyond referenced portions of submitted evidentiary materials, it is not required to do so and should be wary of making a party's case for it.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998).  With respect to legal arguments specifically, a district court may grant summary judgment as to issues raised by a movant but not addressed or rebutted by a nonmovant.  *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992) (holding that nonmovant's failure to rebut the arguments raised in summary judgment motion was fatal to an attempt to raise and rebut such arguments on appeal); *see also Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768-69 (10th Cir. 2001) (unpublished opinion) (affirming summary judgment on a claim abandoned in nonmovant's summary judgment briefing).

In light of the forgoing, the Court finds that the defendants have abandoned their ability to challenge the Secretary's claims that they are covered employers under the FLSA, or that they

---

Secretary's claim that what the employees were paid did not reach the minimum wage or overtime requirements specified in the FLSA.  With respect to the recordkeeping allegation, the defendants state that they "do not deny that the records were less than perfect and failed to meet the required FLSA standards."  (Doc. 213 at 8).

violated the FLSA's minimum wage, overtime, and recordkeeping provisions.  *See Coffey*, 955 F.2d at 1393.  Accordingly the Court grants the Secretary's summary judgment motion as to these issues.

### b.  Willfulness

Although the defendants concede that they have violated the minimum wage, overtime, and recordkeeping provisions of the FLSA, they dispute the Secretary's claim that those violations were willful.  The distinction makes a difference for determining the applicable statute of limitations, a determination which in turn affects the damages for which the defendants ultimately will be liable.  In general, the FLSA imposes a two-year statute of limitations on actions for unpaid minimum wages, overtime compensation, or liquidated damages.  29 U.S.C. § 255.  Where a defendant's violations are willful, however, a three-year period applies.  *Id.*  A violation is willful where "the employer either knew or showed reckless disregard for the matter of whether its conduct violated the statute."  *Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266, 1270 (10th Cir. 2011) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  A plaintiff can show reckless disregard through "action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *Id.* (quoting *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 68 (2007)).

The Secretary argues that the defendants' violations of the FLSA were willful on nine bases, each of which is discussed below.  Discerning a defendant's state of mind is rarely an easy task.  That task here, it will be seen, is made more difficult still by Aguirre's occasionally imperfect grasp of the English language.  As a general matter, the Court is guided in its decision by the principle that cases involving knowledge, motive, or intent are not well suited to summary disposition.  *See Baum v. Great Western Cities, Inc.*, 703 F.2d 1197, 1210-11 (10th Cir. 1983)

("Questions of intent which involve intangible factors, including witness credibility, are matters for consideration of [the] fact finder after a full trial."); *Vail Associates, Inc. v. Vend-Tel-Co.*, 516 F.3d 853, 869 (10th Cir. 2008) (citing *Baum*) (same); *see also Fowler v. Land Mgmt. Groupe, Inc.*, 978 F.2d 158, 163 (4th Cir. 1992) ("[T]he issue of 'willfulness' should be treated [like] . . . other factual determinations relating to application of a statute of limitations that are routinely submitted to the jury."); *cf. Fowler v. Incor*, 279 F. App'x 590, 602 (10th Cir. 2008) (unpublished opinion) (acknowledging *Baum*'s admonition before granting summary judgment to defendant-movant on issue of willfulness in FLSA case).

1. *Fabricated Employee Work Hours*

To show willfulness, the Secretary first argues that the defendants instructed their managers to fabricate employees' work hours, and in support of this claim cites to a portion of the following deposition testimony:

> Q.      . . . How did the managers know not to keep the right hours . . . ?
> . . .
>
>          THE WITNESS:      By the way I tell you before, I think before the investigation, that was not right hours, but after investigation, that was right hours.
> BY MR. SALLUSTI:
>          Q.      Okay.  So during – during – again, we're taking about the first Harvard investigation.
>          A.      Yeah.
>          Q.      Okay.  How – how did the – how did the managers know not to keep the right hours, is what I'm asking you about.
> . . .
>          THE WITNESS:      I don't know about that.
> BY MR. SALLUSTI:
>          Q.      Did you tell them not to worry about keeping the hours prior to the Department of Labor's first Harvard investigation?
>          A.      Before – and I tell them just trying to write like a 45 hours, something like that.
>          Q.      And it didn't matter if it was right?
>          A.      Didn't matter.

(Doc. 191-6 at 109:21 – 110:21).   Taken in the light most favorable to the defendants, this testimony does not support the Secretary's claim that the defendants instructed their managers to fabricate time records.   The witness, defendant Aguirre, appears confused by the line of questioning and, outside the portion cited by the Secretary, initially states that he does not "know about that."   (*Id.*).   Aguirre does go on to say that he instructed "them" to write, for example, 45 hours, regardless of whether that number was "right," but Aguirre's statement leaves open the possibility that he instructed his managers to record the approximate hours his employees worked.   (*Id.*).   In other words, Aguirre's testimony can be read to indicate, as the defendants argue, imprecise records that round or approximate, as opposed to intentionally fabricated records.   Most important, Aguirre clearly indicates that whatever he instructed his managers to do, he so instructed them before the first investigation and altered his behavior once that investigation alerted him to the fact that he was not in compliance with the FLSA.   Rather than demonstrating the defendants' willfulness, this change in course suggests that the defendants' violations prior to the First Harvard Investigation were not willful.   The evidence cited by the Secretary can be read to show that the defendants altered their behavior once they became aware of the unjustifiably high risk that their imprecision violated the FLSA.[2]

---

[2] The defendants' liability, of course, does not turn on their awareness of the unjustifiably high risk, as the reckless disregard standard for willfulness is satisfied where the risk is so obvious that the defendants should have known of it, regardless of whether they did in fact.   *Mumby*, 636 F.3d at 1270.   However, the Secretary's evidence is designed to demonstrate knowledge—*i.e.*, that Aguirre directed the fabrication of records because he knew his conduct violated the law. The facts identified by the Secretary do not establish that, as an objective matter, the defendants should have known that imprecise records ran an unjustifiably high risk of violating the FLSA. This same reasoning applies to Aguirre's purported instructions to lie.   *See infra 3. Instructed Employees to Lie.*

*2.   Purported Misrepresentation Regarding FLSA Compliance*

Next, the Secretary argues that the Court should infer willfulness from the fact that the defendants "lied to WHI Saint-Hilaire about paying employees for all their work hours and recording those hours accurately." (Doc. 191 at 26). The weakness of the Secretary's case on this point is suggested, paradoxically, by the sheer number of pages of deposition testimony—more than 20—to which he feels the need to cite for what should be a straightforward point. (*See Id.* at 26). As the defendants note, nowhere in these pages does defendant Aguirre say that he lied to Saint-Hilaire. He repeatedly confirms that his hour reports were inaccurate, and states that he revealed these inaccuracies to Saint-Hilaire. (*E.g.*, Doc. 191-3 at 121:8-11 ("This is all hours. Did you tell her those hours on these style documents was not accurate? . . . THE WITNESS: Yes.")). One could certainly infer that the defendants knew the reports were inaccurate at the time when they first turned them over to the DOL, thereby effectively lying to Saint-Hilaire. Such an inference, however, is for a jury to make.

*3.   Instructed Employees to Lie*

The Secretary alleges that the defendants instructed their employees to lie to Saint-Hilaire and tell her that they received an hourly wage rather than a salary. (Doc. 191 at 26). At his first deposition, Aguirre admitted that before the DOL investigated any of his restaurants he instructed his Harvard restaurant employees to tell the DOL they were paid by the hour:

> I told them that maybe somebody from the Department of Labor, they are going to ask them . . . how they get paid, if they get paid by the hour or weekly. And I told them just to tell them you get paid by the hour. . . . And that was not true.

(Doc. 191-3 at 190:21 – 191:8). At a second deposition, Aguirre testified that once the First Harvard Investigation had begun he told his employees to tell Saint-Hilaire that "they were

actually being paid for all hours worked." (Doc. 191-6 at 117:13-16).[3] Asked whether he thought that in doing so he was asking his employees "to be less than truthful with her," Aguirre asked to have the question repeated, received clarification, and testified "I think so." (*Id.* at 117:20 – 118:19).

The defendants acknowledge that Aguirre admitted that he instructed his employees "to represent to Ybelka Saint-Hilaire information which was untrue." (Doc. 213 at 10). They suggest, however, that when he gave those instructions Aguirre did not know he was in the wrong as he had yet to consult with a lawyer regarding the requirements of the FLSA. (*Id.*). Of course, the Secretary's point is that Aguirre's instruction to lie makes sense only if he knew—or at least suspected—that the FLSA required him to pay his employees an hourly wage.

In other words, Aguirre's admission without doubt suggests willfulness. Aguirre appears to have asked his employees to lie about how they were paid because he believed he either was or might be in violation of the FLSA. From the evidence offered by the Secretary, however, we cannot know when Aguirre first suspected that his conduct violated that law. It could be that the investigation itself, or perhaps a conversation Aguirre had with Saint-Hilaire, alerted him to the fact that his practices violated or ran a significant risk of violating the law. Indeed, Aguirre has testified that following the investigation—which made clear to him that he was in violation of the FLSA—he sought to comply with federal law. (*See, e.g.*, Doc. 193-1 at 191:6-9). The same evidence, then, reasonably could be read to suggest that Aguirre's actions did not entail an unjustifiably high risk of violating federal law—that, realizing he was in violation of the law, he told his employees to lie about past practices even as he set about changing those practices in an

---

[3] More precisely, Aguirre testified that he had made this admission regarding the First Harvard Investigation to Saint-Hilaire during the Second Harvard Investigation.

attempt to comply with the law.  Given this possibility, and recognizing that questions of intent are best left to a jury, the Court finds this material fact in dispute.

    *4.  Purportedly Falsified Timesheets*

    The Secretary further purports to show that the defendants' violations were willful by accusing the defendants of providing Saint-Hilaire with handwritten, falsified timesheets.  (Doc. 191 at 26).  In support of this argument, the Secretary again points to many pages of deposition testimony related to inaccurate documents.  (*See, e.g.*, Doc. 191-3 at 217:23 – 218:3 ("So when you said that you had documents that had the hours worked not right, these are the documents? . . . A.  Not accurate, yes."); *see also id.* at 227:10-17 ("[T]his is before you accurately corrected them? . . . But that's the information you gave to [your accountant]? . . . But it wasn't right?  A. But it was not right.")).  In short, from his deposition testimony, Aguirre appears to have given inaccurate time records to Saint-Hilaire, and seems to have known at the time that they were inaccurate, although the testimony does not leave this perfectly clear.  (Doc. 191-6 at 104:2-18).

    The defendants admit that these records were not accurate enough to meet the strictures of the FLSA, but argue that their imprecision was not so egregious as to demonstrate that the defendants willfully violated the FLSA.  (Doc. 213 at 11).  Aguirre himself testified that he had agreed with Saint-Hilaire that the documents were not accurate because they were "not precise. . . . That's only like estimate [sic]."  (Doc. 213-7 at 438:7-22).

    From the evidence cited by the Secretary, it is not clear why or to what degree the documents were inaccurate; nor is it clear whether Aguirre alerted Saint-Hilaire to the fact that the documents he gave her were estimates only, or whether or not he believed at the time that his process for recording and calculating wages was sufficient to comply with the FLSA.  Given

their ambiguity, these facts, taken in the light most favorable to the defendants, do not convince the Court that as a matter of law the defendants violations were willful.

### 5.   Continued Illegal Practice

Next, the Secretary argues that, even after the defendants were investigated and notified of the FLSA's requirements, they continued to pay their employees a fixed weekly salary, rather than by the hour.  (Doc. 191 at 27).  In support of this proposition, the Secretary cites to a portion of Saint-Hilaire's deposition testimony, in which she states that she "advised Mr. Aguirre what the law states and what a proper pay method would be."  (Doc. 191-23 at 69:23-24).  The Court finds the evidence insufficient to support the proposition for which it is cited, let alone to demonstrate willfulness on the part of the defendants.

### 6.   Kickbacks

Aguirre admits that after he made back-wage payments to his employees, as required by the Harvard Settlement, five of his managers returned the money:

> You know, like, the managers, the guys been working for me, like, seven or eight years.  You know, whenever they get their check, they say, If [sic] I keep the money, I'm not going to feel happy because I know you give us a lot of money for bonus and we've been really happy working for you. . . . I told them, Anything [sic] you want to do, because later I don't want to, like, later you change your mind or something.  And he say no, you better take the money and let me cash the check, and I gave you the money.

(Doc. 191-3 at 210:15 – 211:18).  The Secretary does not explain why this testimony suggests that Aguirre withheld the wages willfully in the first place.  If such an inference could be made, it is for a jury to make.

### 7.   Casio Register Time Reports

In January of 2012, the defendants began to use an electronic clock-in clock-out system to record the hours worked by their employees.  In February of this year the Secretary amended

13

his complaint a third time to add allegations that the defendants "have manually altered the electronic time record weekly reports in order to reduce the actual hours shown worked by employees."  (Doc. 165 at 3).  Although the defendants, in their Response, present evidence to contest the Secretary's claims (Doc. 213 at 12), the defendants failed to file an amended answer denying these allegations and as a result they are deemed admitted under Rule 8(d). [4]  *See, e.g.*, *Burlington N. R. Co. v. Huddleston*, 94 F.3d 1413, 1415 (10th Cir. 1996) (citing Rule 8(d)) ("By failing to submit an answer or other pleading denying the factual allegations of Plaintiff's complaint, Defendant admitted those allegations, thus placing no further burden upon Plaintiff to prove its case factually.").

For the period from January 2012—when the defendants began to use the Casio recorders—on, this admission is damaging.  One also could reasonably infer from this admitted, intentional violation of the FLSA that FLSA violations committed before January 2012 were willful.  However, one could just as reasonably believe that, while this admission indicates willful violations following the implementation of the Casio recorders in January 2012, it does not necessarily reveal anything about the defendants' state of mind before January 2012 or with respect to other violations.  To extend the statute of limitations from two years to three years, the Secretary must show that the defendants' violations were willful in the relevant period, that is, in the time frame from October 22, 2009, to October 22, 2010.  An admission indicating willful violations in 2012, while tending to suggest willfulness in the relevant period, is insufficient to settle the matter for purposes of summary judgment.

---

[4] The defendants were denied leave to file an untimely amended complaint for failure to show excusable neglect.  *See infra* d. Liquidated Damages.

8.   *Privilege Waivers*

In an attempt to overcome the Secretary's assertion of the informer's privilege during discovery,[5] the defendants submitted around 90 pages of forms from individuals purporting to waive all privileges "concerning information from me or about me" in this case.  (Doc. 100-1). Magistrate Judge Cleary found evidence that the employees were not "fully informed as to the meaning of the waiver or their ability to refuse to sign such a form" sufficient to warrant granting a protective order to prevent retaliation against informing employees and inquiries regarding information or testimony provided to the DOL.  (Docs. 162, 163).  Judge Cleary noted that "[m]uch of the protection sought [by the Secretary] is already required under the Fair Labor Standards Act," and thus the good cause balancing test for protective orders was easily met. (Doc. 162 at 2-3).  Said differently, Judge Cleary's Order did not conclusively settle this question of fact, and the defendants continue to allege that the "waivers were properly obtained after a full and honest explanation by [defendant] Carlos Aguirre."  (Doc. 213 at 17).

Assuming, however, that the defendants obtained these waivers through deceit and in an attempt to discover information provided to the DOL by current or former employees, or even to discover the identity of those employees, the Secretary has not explained how this fact demonstrates that the defendants' FLSA violations were willful.  Presumably the Secretary would like the Court to make the following inferences: (1) the defendants obtained the waivers in an attempt to discover informant employees; (2) the defendants hoped to discover informant employees to retaliate against them; and (3) a desire to retaliate implies that the original

---

[5] "What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law."  *Roviaro v. United States*, 353 U.S. 53, 59 (1957).

violations were willful.  Of course, at this stage the Court must make all reasonable inferences in favor of the nonmovants, and accordingly must leave this question of fact to a jury.

9. *Defendants' Expert's Interview*

Finally, the Secretary argues that the defendants' willfulness is demonstrated by the fact that they "had their managers tell employees that the person who interviewed them in August 2014 was an official from the United States Department of Labor when in fact he was Defendants' expert."  (Doc. 191 at 27).  The Secretary cites the following deposition testimony in support of this proposition:

> Q.      Did Refugio Flores Mendez ever tell you that the Department of Labor was going to come and conduct employee interviews?
> A.      Yes.
> Q.      Do you remember when that was?
> A.      No.
> Q.      Did he call you to tell you this?
> A.      Personally.

(Doc. 191-20 at 79:11-18).  In response, the defendants point out that this testimony does not, on its face, support the Secretary's assertion.  (Doc. 213 at 14).  The Secretary replies that the DOL "does not typically inform employers in advance that it is coming to their worksite to conduct inspections."  (Doc. 219 at 12 n.7).  Even assuming this conclusory statement is true, the fact that the DOL does not typically give advanced notice of inspections does not rule out the possibility that in this instance they called in advance to arrange interviews.  Evidence of the DOL's typical practice, to the extent that it exists, and inferences that can be made about specific actions from that general practice, are properly left to a jury's consideration.[6]

---

[6] The Secretary additionally asserts that he "moved for and was granted a protective order on these issues and will not re-litigate issues that have already been adjudicated by this Court." (Doc. 219 at 12).  As noted above, evidence sufficient to warrant a protective order will not necessarily suffice to decide issues on the merits; courts employ a balancing test for the former and, in civil cases, a preponderance of the evidence standard for the latter.  Protective orders are

In short, the many pages of deposition testimony cited by the Secretary have left the Court uncertain as to the state of mind of the defendants.  One picture that emerges is of a bewildered Carlos Aguirre, who at times struggles to understand and make himself understood in English, and who reasonably could be understood to have wished genuinely to bring his business into compliance with federal law.  To be sure, the Secretary puts forward a strong case for a finding of willfulness.  At this stage in the proceedings, however, the Court is not permitted to make the inferences that would necessarily underlie that finding.  Hence, the question of whether the defendants' violations of the FLSA were willful will be left to the factfinder.

### c.  Back Pay Calculation

As noted above, the defendants admit that their records, such as they were, "failed to meet the required FLSA standards."  (Doc. 213 at 8).  Where an employer has not kept legally sufficient records, an FLSA plaintiff who has proven that he performed improperly compensated work faces a reduced burden of proof with respect to the calculation of damages.  Specifically, the plaintiff need produce only "sufficient evidence to show the amount and extent of th[e] work as a matter of just and reasonable inference."  *Donovan v. United Video, Inc.*, 725 F.2d 577, 583 (10th Cir. 1984) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686 (1946)).

> The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* at 583-84 (quoting *Mt. Clemens*, 328 U.S. at 686).

---

designed not to determine factual issues but "to protect a party from annoyance, embarrassment, oppression, or under burden or expense" during discovery, Fed. R. Civ. P. 26(c)(1)(A), and remain modifiable at the discretion of the Court.  *Rohrbough v. Harris*, 549 F.3d 1313, 1321 (10th Cir. 2008).

In *Donovan*, 725 F.2d at 583, the Tenth Circuit considered an award of damages calculated from a combination of employee deposition testimony, the employer's payroll records, the compliance officer's computations, and the compliance officer's testimony regarding his computational method.  Applying the *Mt. Clemens* standard, the Court of Appeals upheld the award, finding it "sufficient evidence to establish, 'as a matter of just and reasonable inference,' the number of overtime hours worked and the amount of unpaid compensation due." *Id.*

"Having failed to keep accurate time records for the employees in question, [the defendants] cannot be heard to complain that the back wage award lacks the precision of measurement that would be possible had it maintained proper records." *Id.* at 584.  Here, the Secretary's expert, Michael D. Speer,[7] has availed himself of the evidence available to him, basing his calculations on the defendants' payroll summaries, back wage computation sheets prepared by Saint-Hilaire during her investigations, the defendants' quarterly payroll tax reports, spreadsheets provided by the defendants to their accountant, the defendants' Casio electronic weekly timesheets, and the defendants' expert report.  (Doc. 193).  As in *Donovan*, Speer has submitted a Declaration explaining his computational method.  (*Id.*).  In the absence of substantive records, the Secretary's—and the Court's—reliance on these materials is appropriate and necessary.  *Donovan v. United Video, Inc.*, 725 F.2d 577, 584 (10th Cir. 1984); *see also Hodgson v. Humphries*, 454 F.2d 1279, 1282 (10th Cir. 1972) (explaining that while records that comply with the FLSA are the most persuasive, where such records are unavailable it is permissible to rely on "computation sheets" as well as employee testimony "concerning the

---

[7] Speer is the District Director for the Oklahoma City District Office of the Wage and Hour Division of the United States Department of Labor.  His district includes the Tulsa Area Office. (Doc. 193 at 1).

approximate dates of their employment, the number of hours they generally worked, and the precise amount of wages they received").

In response, the defendants have failed to produce precise records of their employees' work hours.  In an attempt to impugn Speer's calculations, they misleadingly argue that their expert, William Cutler, contests Speer's analysis, and as evidence point to Cutler's report, from which they offer the following quotation:

> The investigations conducted by Plaintiff and the amounts of back wages calculated by Plaintiff to date in this case appear to be in error in many instances, fundamentally flawed, significantly excessive, and unreliable.

(Doc. 213 at 15).  As Speer explains in his Declaration, however, Cutler's report, and the criticisms it contains, preceded the report at issue here.  Indeed, Speer relied on Cutler's report to revise his calculations of the wages owed by defendants.  (Doc. 193).  That is, according to Speer he incorporated and accounted for Cutler's critiques—for example, removing weeks to account for vacation and sick days[8]—to address the methodological objections put forward by the defendants.  (*Id.*).  The defendants do not address these accommodations, either as to their adequacy or completeness, and as a result fail to meet their burden to "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence," *Donovan v. United Video, Inc.*, 725 F.2d at 584, or otherwise to create a triable issue of fact.

---

[8] Several of Cutler's critiques are reminiscent of those raised by the defendant in *Donovan*: "[The defendant's] only attempt to negative the reasonableness of the inferences is to argue that its time records are unreliable because the employees generally recorded eight hours each work day even if fewer hours were worked while they were on call, and because the company allowed the employees to take compensatory time off."  *Donovan*, 725 F.2d at 584.  As was the case there, the defendants' arguments are without merit as Speer has attested that his revised report incorporates Cutler's critiques.  (Doc. 193); *Donovan*, 725 F.2d at 584.

In addition to their citation to Cutler's report, the defendants object that the Secretary's back pay calculations are inaccurate on three grounds.  (Doc. 213 at 15-17).  They argue (1) that the Secretary does not explain how the damages were calculated; (2) that by failing to account for discretionary bonuses the DOL has miscalculated the amount of damages actually owed; and (3) that the Secretary's expert miscalculated the amount still owed under the Harvard Settlement–the settlement agreement reached with the DOL as a result of the Second Harvard Investigation.  (*Id.*).

The defendants' first argument is patently frivolous.  Speer submitted a six-page, single-spaced Declaration introducing thousands of pages of attachments and describing his calculation method in detail.  (Doc. 193).

With respect to discretionary bonuses, the defendants cite to their Opposition to the Secretary's motion to exclude expert testimony (Doc. 200), apparently for the proposition that under the FLSA discretionary bonuses are excluded from regular rate calculation.  What the defendants do not do is cite to any evidence in the record, or even make an argument to suggest, that the defendants meted out discretionary bonuses to their employees.  Having presented no evidence, the defendants fail to create a triable issue of fact.

On the third issue, however, the defendants do manage to create a factual dispute.  Namely, by way of affidavit defendant Aguirre attests that he made payments required by the Harvard Settlement to seven employees.  The Secretary argues that the Court should reject this affidavit as creating a sham issue in line with *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).  However, the Secretary does so without identifying prior testimony from Aguirre which his affidavit might be said to contradict.  As a result, the Court finds that this is not "one of those unusual cases in which the conflict between the testimony and the affidavit raises only a sham

issue." *Id.*; *see also Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009).  Put simply, no such conflict is alleged.

As for the $45,442.62 which the defendants paid to employees pursuant to the Harvard Settlement and which the employees then returned to the defendants, the defendants remain liable for the full amount.  *Marshall v. Quik-Trip Corp.*, 672 F.2d 801, 807 (10th Cir. 1982) ("[T]he employer's obligation under a consent decree to pay back wages [is not] . . . extinguished where the employee voluntarily repays part or all of the sum to the employer").

Accordingly, given the lack of reliable employer records in this case, the Court finds that the Secretary has met his burden of establishing the amount of damages in the instant case except as to the payments Aguirre claims to have made in compliance with the Harvard Settlement and which were not returned to the defendants.

### d.  Liquidated Damages

Under the FLSA, an employer who violates the statute's overtime or minimum wage provisions is liable for both the unpaid wages and "an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  However, an employer may avoid liquidated damages by showing "that the act or omission giving rise to [the] . . .  action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act."  29 U.S.C. § 260.  In other words, an employer's actions must meet both a subjective (good faith) and an objective (reasonableness) standard to enable a district court to eliminate or reduce the award of liquidated damages.  *Dep't of Labor v. City of Sapulpa, Okl.*, 30 F.3d 1285, 1289 (10th Cir. 1994).  An employer who acts in good faith has "an honest intention to ascertain and follow the dictates of the Act."  *Id.* (citing *Renfro v. City of Emporia, Kan.*, 948 F.2d 1529, 1540 (10th Cir. 1991).

Reasonable, good-faith belief of compliance must be pled as an affirmative defense in compliance with Fed. R. Civ. P. 8(c).  *See, e.g.*, *Nguyen v. Excel Corp.*, 197 F.3d 200, 205 (5th Cir. 1999); *Gayle v. Harry's Nurses Registry, Inc.*, 594 F. App'x 714, 718 (2d Cir. 2014) (unpublished opinion) *cert. denied*, 135 S. Ct. 2059 (2015).  Under Rule 8(c), a party waives any affirmative defense it fails to timely raise.  *Renfro v. City of Emporia, Kan.*, 948 F.2d 1529, 1539 (10th Cir. 1991) (affirming summary judgment against FLSA defendant, in part because defendant's failure to plead affirmative defense prior to summary judgment ruling constituted waiver).

The defendants filed their Answer (Doc. 34) to the Second Amended Complaint (Doc. 24) on August 16, 2013.  Although they asserted each of the 18 affirmative defenses listed under Rule 8(c)—including clearly irrelevant defenses like contributory negligence, injury by servant, and laches—the defendants did *not* assert the relevant affirmative defense provided by the Act. (*See* Doc. 34).  In February of 2015, the Secretary filed his Third Amended Complaint, which offered the defendants yet another opportunity to raise their affirmative defense.  (Doc. 165). The deadline to file a response passed on February 19, and the defendants made no responsive filing of any sort.

Another month passed and, on March 19, 2015, the Secretary moved for summary judgment.  (Doc. 190, 191).  On the issue of liquidated damages, the Secretary argued that the defendants had waived their right to assert the affirmative defense of good faith.  (*Id.*).  Only then did the defendants move for leave to file an amended answer out of time.  (Doc. 196). Remarkably, the attached proposed amended answer still failed to plead the affirmative defense of good faith and reasonable grounds.  (Doc. 196-1).  Finally, on April 23, 2015, the defendants moved to supplement their motion to file an out-of-time answer, seeking to add to their proposed

answer an affirmative defense of good faith and reasonable grounds.  (Doc. 207).  The same day, the Court denied the motion for leave to file an amended answer out of time, as the defendants had failed to make a showing of excusable neglect for their delay.  (Doc. 209).

The defendants clearly failed to meet Rule 8(c)'s requirement that defendants, in general, plead any affirmative defense they might have.  This failure is not necessarily fatal, however, to their ability to raise the defense, as the purpose of Rule 8(c) is to provide particularized and specific notice of certain defenses, and where a plaintiff has adequate notice of an affirmative defense, a court may allow a defendant to assert it late in the proceedings.  *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1077 (10th Cir. 2009) (citing *State Distributors, Inc. v. Glenmore Distilleries Co.*, 738 F.2d 405, 411 (10th Cir. 1984)).  Nevertheless, because the defendants have not asserted reasonable grounds for believing that their acts and omissions did not violate the FLSA, the Court need not decide whether they may submit evidence in support of their belated affirmative defense.

At the summary judgment stage, the moving party—here, the Secretary—must initially show both an absence of a genuine issue of material fact, as well as entitlement to judgment as a matter of law.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).  The nature of the showing depends upon whether the movant bears the burden of proof at trial with respect to the particular claim or defense at issue in the motion.  If the nonmoving party bears the burden of proof, the movant need not "support its motion with affidavits or other similar materials negating the opponent's" claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Instead, the movant can satisfy his obligation simply by pointing out the absence of evidence on an essential element of the nonmovant's claim.  *Adler*, 144 F.3d at 671 (citing *Celotex*, 477 U.S. at 325).

Because the defendants bear the burden of proof at trial with respect to their affirmative defense, the Secretary need only point out the absence of evidence on either the good faith or reasonable grounds element of the defendants' claim.  By arguing in his Motion that the defendants do not have a claim for good faith or reasonable grounds (Doc. 191 at 32), the Secretary shifted the burden to the defendants to come forward with evidence in support of their affirmative defense.  In response, the defendants presented evidence of the defendants' good faith intentions to comply with the FLSA, but made no argument regarding whether the defendants had reasonable grounds for believing they were in compliance.[9]  (Doc. 213 at 17-19). The defendants focus their efforts on the good faith element, arguing that their "honest intention to ascertain and follow the law" foundered on defendant Aguirre's lack of understanding of the requirements of the FLSA.  (Doc. 213 at 18, 2).  Whatever the validity of this argument with respect to the good faith element of the defendants' affirmative defense, it does nothing to support the objective element, as "an employer's ignorance of the requirements of the FLSA does not constitute reasonable grounds for believing that it complied with the statute."

---

[9] The defendants do assert that defendant Aguirre sought legal counsel and reached out to Saint-Hilaire "to ask her help verifying that the new Casio computer/register and his new systems were in compliance."  (Doc. 213 at 2).  Reliance on attorneys, experts, or the DOL compose the typical forms of evidence courts find persuasive in holding FLSA violations reasonable.  *Pabst v. Oklahoma Gas & Elec. Co.*, 228 F.3d 1128, 1136 (10th Cir. 2000); *Ackley v. Dep't of Corr. of State of Kan.*, 844 F. Supp. 680, 688 (D. Kan. 1994).  Even if the Court found this evidence to support a claim that the defendants had reasonable grounds for believing they were in compliance, however, these grounds would apply only to the period during which they used the Casio machines.  Because the defendants have admitted that they altered the Casio time records in order to reduce the number of hours worked by—and wages paid to—their employees, the defendants have no claim of good faith during that same period.  The defendants, of course, must present evidence sufficient to support both elements of their affirmative defense, and as a result are not helped by evidence that they sought counsel from Saint-Hilaire regarding purported latter attempts at compliance.

*Terwilliger v. Home of Hope, Inc.*, 21 F. Supp. 2d 1294, 1304 (N.D. Okla. 1998) (citing *Doty v. Elias,* 733 F.2d 720, 726 (10th Cir.1984)).

Accordingly, because the defendants have not met their burden to present evidence of the objective reasonableness of their FLSA violations, the Secretary's Motion for Summary Judgment is granted with respect to liquidated damages.

### e.   Injunction

Finally, the Secretary asks the Court to enjoin defendants from committing future FLSA violations, based on their "pattern of violations and deceit," continued violations following the first DOL investigation, the lack of any "extraordinary efforts to prevent violations," and efforts purportedly taken by the defendants to deter their employees from reporting violations.  (Doc. 191 at 33-34).  The defendants contest only the claims that they threatened or deceived their employees or otherwise attempted to deter them from reporting violations to or communicating with the DOL.  (Doc. 213 at 19-20).

Section 17 of the FLSA empowers district courts to issue injunctions against violations of the Act, including the overtime and record keeping provisions.  *Metzler v. IBP, Inc.*, 127 F.3d 959, 963 (10th Cir. 1997); *see also* 29 U.S.C. §§ 207, 211, 215, 217.  "Permanent prospective injunctions serve to effectuate congressional policy against substandard labor conditions by preventing future violations."  *Id.* (citation omitted).  Such injunctions are remedial rather than punitive.  *Id.* (citations omitted).  The Secretary, as movant, bears the burden to show that the injunction is necessary.  *Id.* (citation omitted).  Prospective injunctions place no substantial hardship on employers as they require no more than what the Act does—compliance with the law.  *Id.* (citation omitted).

For a district court to issue a permanent injunction, there must exist "some cognizable danger of recurrent violation, something more than . . . mere possibility." *Id.* (citation omitted). While a showing of past violations can support a permanent injunction, a permanent injunction may issue without such a showing. *Id.* The fact that a defendant is currently in compliance with the FLSA is not enough to deny injunctive relief, especially where that compliance is the result of government scrutiny. *Id.* (citation omitted).

In deciding whether to grant a prospective injunction, district courts consider a variety of factors, including the employer's previous conduct, its current conduct, and the reliability of its promises of future compliance. *Id.* (citation omitted). In cases in which the court finds a past violation, it must "balance that finding against factors indicating a reasonable likelihood that the violation will not recur, such as the employer's intent to comply, extraordinary efforts taken to prevent recurrence, the absence of repetitive violations, and the absence of bad faith. *Id.* at 963-64 (citations omitted).

The defendants have repeatedly argued that it has always been their intention to comply with the FLSA and that they plan to do their best to comply in the future. Furthermore, the defendants have alleged enough facts to make a triable issue of their lack of bad faith. However, the defendants have admitted to past conduct in violation of the FLSA, and further violations following and in spite of intervention by the DOL. Their difficulty achieving compliance suggests that additional encouragement is warranted to ensure the reliability of their promises of future compliance, yet the defendants make no attempt to suggest any "extraordinary efforts" they have taken or might take to prevent recurrence. Given their admissions, even taken in the light most favorable to the defendants the facts indicate that the defendants have repeatedly failed to comply with the dictates of the FLSA in spite of a good faith desire to do so and

government oversight.  Additional encouragement is required.  In an effort to promote their compliance the Court accordingly orders the defendants to do what the law already requires of them, and hereby enjoins the defendants from committing future violations of the FLSA.

## III.    Conclusion

By failing to address or rebut the Secretary's arguments that they are covered employers under the FLSA, or that they violated the FLSA's minimum wage, overtime, and recordkeeping provisions, the defendants have abandoned their ability to contest these claims and as a result the Secretary's summary judgment motion is granted as to these issues.  As issues of material fact persist with respect to the question of the willfulness of the defendants' violations, and recognizing that questions of intent are best reserved for the factfinder, the Secretary's summary judgment motion is denied as to willfulness.

In light of the lack of reliable employer records in this case, the Court also grants the Secretary's Motion as to his damages calculation, except that this portion of the Motion is denied as to the payments defendant Aguirre claims to have made in compliance with the Harvard Settlement, which were not then kicked back to the defendants.  The Court notes that the final damages calculation may require modification, depending on the outcome of trial regarding both the defendants' willfulness and Aguirre's claim to have partially complied with the settlement agreement.

As the defendants have submitted no evidence or argument, other than ignorance of the law, to show reasonable grounds for their belief that they were in compliance with the FLSA, the Secretary's Motion is granted as to liquidated damages.

Finally, the Court hereby enjoins the defendants from committing further violations of the FLSA.

**IT IS THEREFORE ORDERED** that the United States Secretary of Labor's Motion for Summary Judgment (Doc. 190, 191) is **granted in part** in accordance with this Opinion and Order.

**SO ORDERED** this 10th day of July, 2015.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE