UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THOMAS E. PEREZ, Secretary of Labor, United States Department of Labor, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 12-CV-588-JED-PJC ) |
| EL TEQUILA, LLC, and CARLOS AGUIRRE, Individually, | ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

The jury was asked to answer a single question: "During the period of October 22, 2009 through October 21, 2010, was Defendants El Tequila, LLC and Carlos Aguirre's failure to comply with the requirements of the Fair Labor Standards Act 'willful?'" (Doc. 296). The Court instructed the jury that the defendants' violations of the Fair Labor Standards Act (the "FLSA" or the "Act") were willful if the defendants either knew that their conduct violated the FLSA or showed reckless disregard for the matter of whether it did. (Doc. 294 at 29; *see also Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266, 1270 (10th Cir. 2011) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). The Court further instructed the jury that the defendants showed "reckless disregard" for the dictates of the Act if their conduct entailed an unjustifiably high risk of harm that was either known to them or so obvious that it should have been known. (*Id.*).

Over the course of five days, the United States Secretary of Labor (the "Secretary") put forth a devastating case against the defendants. As noted, one issue—the willfulness of the defendants' violations—had survived summary judgment by the narrowest of margins. (*See* Doc. 233). The evidence the Secretary presented at trial proved several-fold that the defendants

acted willfully when they violated the FLSA. This evidence went largely uncontested by the defendants. Indeed, much of the evidence came from defendant Carlos Aguirre himself.

On the stand and in the presence of the jury, Aguirre admitted that he paid his employees a weekly salary rather than the minimum wage and overtime required by the FLSA. He further admitted that he kept two sets of records—falsified records that indicated he paid his employees minimum wage and overtime, and a parallel set of accurate wage records he kept hidden from his accountant. These admissions alone—that Aguirre violated the FLSA and disguised his violations with counterfeit records—demonstrate, at a minimum, that the defendants showed reckless disregard for the matter of whether their conduct violated the Act.

But Aguirre was far from finished. He admitted that when Wage and Hour Investigator Ybelka Saint-Hilaire investigated one of Aguirre's restaurants he withheld the accurate records from Saint-Hilaire and provided her with the fabricated records. Under oath Aguirre admitted to lying to Saint-Hilaire about these records and about the pay practices he actually employed. Further, Aguirre admitted that he instructed several of his employees to lie to her about those same practices. The Secretary's evidence would have met a far stricter standard than preponderance of the evidence, and sufficed to show not only a reckless disregard for the law but obvious and indisputable knowledge of it.

Most of the evidence the Secretary presented, it must be said, was evidence of the unquestionable willfulness of Aguirre's FLSA violations *after* October 21, 2010. This evidence supports—indeed, insists on—an inference that Aguirre's violations between October 22, 2009, and October 21, 2010, the "relevant time period," were also willful. However, the Court has before it the Secretary's Renewed Motion for Judgment as a Matter of Law (Doc. 297), and in considering a motion for judgment as a matter of law ("JMOL"), the Court does not make

inferences or other factual conclusions. Based on evidence originating outside the relevant period, a reasonable jury could have decided that Aguirre's willful violations after October 21, 2010, were just that, and did not conclusively show that Aguirre's earlier violations were also willful.

But Aguirre admitted more. He admitted that in the relevant period, between October 22, 2009, and October 21, 2010, he was already falsifying records. Indeed, in this period Aguirre systematically sent fake information to his accountant, Victor Kubli, and Kubli, unaware that the information was inaccurate, generated pay records that made it look as if Aguirre paid his employees minimum wage and overtime. These records clearly stated the minimum wage and overtime amounts required by law, and these were the falsified records that Aguirre presented to Saint-Hilaire during her first investigation in December 2010 to conceal his violations. Thanks to these falsified records, it would take a second Department of Labor investigation for Saint-Hilaire to learn the truth: Aguirre, in plain violation of the FLSA, paid his putative hourly employees neither minimum wage nor overtime.

It is difficult to imagine a clearer case of willfulness. Aguirre's testimony, his admissions—this evidence was uncontroverted at trial. In light of this undisputed evidence, no reasonable jury could have decided, as the jury in this case did, that the defendants did not act willfully when they withheld wages owed to their employees between October 2009 and October 2010. The Court is left with no choice but to direct the entry of judgment as a matter of law in the Secretary's favor under Rule 50(b).

**BACKGROUND**

Defendant Carlos Aguirre controls the operations of defendant El Tequila, LLC (jointly the "defendants"), and through it operates four Mexican-style restaurants in and around Tulsa, Oklahoma. Aguirre is 40 years old. He immigrated to the United States when he was 16, and has been here 24 years.[1] He has extensive experience in the restaurant industry, having worked in restaurants in some capacity since he arrived in this country. Aguirre is also no stranger to managing and compensating employees. He first became a restaurant owner in 1997 and in 2002 opened his first El Tequila restaurant in Tulsa. Business was good, and around three years later Aguirre opened a second El Tequila location. In 2007 he opened a third location, and soon thereafter a fourth.

*The Harvard Investigations*

On December 21, 2010, as the result of an employee complaint, the United States Department of Labor (the "DOL"), through its Wage and Hour Division, began to investigate the defendants' fourth El Tequila restaurant, located in Tulsa at 5001 S. Harvard Avenue (the "First Harvard Investigation"). Wage and Hour Inspector Ybelka Saint-Hilaire conducted the investigation, which included interviewing Aguirre and his employees regarding the hours they worked and wages they received. As part of the investigation, Aguirre provided Saint-Hilaire with payroll summary sheets that he would later admit did not accurately reflect payments made to his employees. At the time, however, Saint-Hilaire took the records at face value, and when she closed the investigation on March 23, 2011, she made a finding of recordkeeping violations only.

Soon after the First Harvard Investigation, Saint-Hilaire received further employee complaints. These complaints included allegations not only that Aguirre had lied to Saint-Hilaire

4

during the first investigation but also that he had instructed his employees to do the same. As a result, on June 29, 2011, Saint-Hilaire began a second investigation of the Harvard restaurant (the "Second Harvard Investigation"). This time Saint-Hilaire determined that, from December 5, 2009, to August 6, 2011, the defendants paid their Harvard location employees a fixed weekly salary, rather than an hourly wage, in violation of the minimum wage and overtime provisions of the FLSA. The defendants settled the Second Harvard Investigation by agreeing to future compliance with the FLSA and to pay wages owed to their Harvard employees for the December 5, 2009, to August 6, 2011, period (the "Harvard Settlement Agreement"). Although the defendants made installment payments, Aguirre has since admitted that a number of his employees cashed their checks and returned the money to him.[2]

The defendants represent that Aguirre believed the Harvard Settlement Agreement to account for violations at all four restaurants and was surprised when Saint-Hilaire sought time and pay records for the defendants' other three restaurants. According to the defendants, alarmed to learn he might owe still more money, Aguirre retained counsel for the first time on November 11, 2011. The parties were unable to reach a settlement regarding the three remaining restaurants.

Two months later, in January 2012, the defendants took steps to modernize their timekeeping process by installing time clock systems at each of their restaurants. The Casio QT 6600 registers the defendants installed allowed the defendants' employees to clock in and out at the beginning and end of their shifts, and thereby recorded the hours they worked. Ostensibly the Casio registers should have facilitated the defendants' future compliance with the FLSA.

*Initial Proceedings*

The Secretary brought suit on October 22, 2012, alleging that the defendants violated the FLSA in three ways: first, by failing to pay employees the statutory minimum wage; second, by failing to pay employees for hours worked in excess of 40 hours per week; and third, by failing to maintain sufficient records of their employees' wages and hours. (Doc. 2). As discovery unfolded and the case developed, the Secretary uncovered evidence suggesting that the defendants continued to violate the FLSA during and after 2012 by manually altering the records produced by the Casio registers. Accordingly, the Secretary amended his complaint in February 2015 to add this allegation. (Doc. 165).

Ruling on summary judgment, the Court found that the defendants had violated the FLSA's minimum wage, overtime, and recordkeeping provisions. The Court also granted the Secretary's summary judgment motion with respect to his calculation of damages and the application of liquidated damages, and enjoined the defendants from committing future violations of the FLSA. (Doc. 233). In the end, one issue survived summary judgment, and barely at that: whether the defendants' violations of the FLSA between October 22, 2009, and October 21, 2010, were willful.[3]

*Trial*

The jury heard testimony from a number of witnesses over the course of five days. Most of this testimony covered events occurring after the relevant time period, including the Casio time recorders that the defendants began using in 2012 to record the hours their employees worked. Aguirre's own testimony regarding the FLSA violations he committed during the relevant time period, however, was uncontroverted.[4]

Aguirre admitted that, as the Court had found at the summary judgment stage, he paid employees a set salary regardless of the number of hours they worked.[5] (Doc. 303 at 246:19-22). Aguirre testified that he set his employees' rate of pay, and that he paid his employees their set salary through a combination of cash and checks.[6] (*Id.* at 247:19-25). Although Aguirre kept handwritten records of how much he actually paid his employees in cash and checks (*id.*), he admitted that his accountant, Victor Kubli, never knew of and was never provided with any of these records. (*Id.* at 261:14-18). Kubli never saw the defendants' records of cash and check salary payments because, Aguirre admitted, Aguirre fabricated a parallel set of inaccurate records and gave these to Kubli instead.[7] (*Id.* at 246:19 – 247:10). And Aguirre enlisted his managers in this scheme:

> Q. [BY THE SECRETARY] And even though you weren't keeping track of employees' accurate work hours, you were creating time sheets listing inaccurate hours; correct?
> A. [BY AGUIRRE] That was not precise.
> Q. You're saying you were not precise, in other words those hours that you were listing on these time sheets, those weren't right; correct?
> A. Yeah, they was not precise.
> Q. That was not correct, that was not right?
> A. Yes.
> Q. Thank you. In fact, you instructed your managers to create time sheets with inaccurate hours; correct?
> A. Yes.

(*Id.*). Aguirre went on to clarify that by "not precise" he meant that the records he gave to his accountant neither reflected the hours his employees actually worked nor had any bearing on how much he would ultimately pay them.[8] Aguirre testified that in spite of his practice of paying employees a set salary, he provided Kubli with hours his employees had purportedly worked so that Kubli could generate payroll sheets that made it appear as if Aguirre were paying his employees in compliance with the FLSA. (*Id.* at 248:4 – 257:5). During the relevant time

7

period, the hours Aguirre gave to Kubli were less than those actually worked by his employees. For example, in reference to records from January 2010 Aguirre testified as follows:

> Q. [BY THE SECRETARY] So none of these employees for this particular pay sheet, none of them are working over 40 hours a week according to this time sheet; correct?
> A. [BY AGUIRRE] No, they worked more.
> Q. They worked more, yes, but this time sheet doesn't show that, does it?
> A. No, that didn't show up.
> Q. It shows that at most they worked 40 hours a week; correct?
> A. Yes.

(*Id.* at 252:4-11; 254:2-11; *see also id.* at 257:9-20). In this example, in other words, although Aguirre's employees had worked in excess of 40 hours a week and thus were entitled to overtime pay, Aguirre avoided paying them what they were owed by reporting in every case 40 hours or fewer to his accountant.[9]

Regardless of the hours Aguirre reported to his accountant, which in any event were a sham, Aguirre paid his employees a set salary in violation of the FLSA. This he hid not only from his accountant but also from the Department of Labor. Specifically, Aguirre admitted that, in December 2010, he took steps to hide from Wage and Hour Investigator Saint-Hilaire the violations he had committed during the relevant period:

> Q. [BY THE SECRETARY] Now, during the first Harvard investigation you told Investigator Saint-Hilaire that you were paying employees on a[n] hourly basis; correct?
> A. [BY AGUIRRE] Yes, I did.
> Q. But that wasn't true, was it?
> A. That was not true.
> Q. You were paying them a salary.
> A. They was getting paid in salary.

(*Id.* at 258:16-23). Aguirre further admitted that, because he was scared and in order to protect his restaurant and his employees, he instructed his employees to tell Saint-Hilaire the same lies.[10]

(*Id.* at 258:24 – 260:23).

Providing his accountant with inaccurate time records allowed Aguirre to continue his practice of paying his employees a set salary while maintaining the appearance of minimum wage and overtime compliance. The records Kubli created, premised on Aguirre's manipulated hours and the rate of pay Aguirre himself set, showed non-tipped employees paid at $7.25 an hour—the minimum wage—and tipped employees paid $3.63 an hour—the state minimum wage for tipped employees.[11] (*Id.* at 249:25 – 250:6; 251:2-9). Aguirre testified that he did not "pay attention" to the hourly rates Kubli listed on payroll summaries Kubli generated, but admitted that he knew the summaries showed a $7.25 an hour pay rate for his employees. (*Id.* at 256:15 – 257:5). He also admitted that the summaries demonstrate his knowledge of overtime pay and how it is calculated:

> Q. [BY THE SECRETARY] Okay. So your payroll summary sheets show that you knew that overtime was paid at a rate of time and a half; correct?
> A. [BY AGUIRRE] Yes.

(*Id.* at 250:14-16).

## DISCUSSION

### I. Judgment as a Matter of Law

Under Federal Rule of Civil Procedure 50(b), a "party is entitled to judgment as a matter of law only if all of the evidence, viewed in the light most favorable to the nonmoving party, reveals no legally sufficient evidentiary basis to find for the nonmoving party." *Burrell v. Armijo*, 603 F.3d 825, 832 (10th Cir. 2010) (citing *Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237, 1243 (10th Cir. 2009) and *Hurd v. Am. Hoist & Derrick Co.*, 734 F.2d 495, 499 (10th Cir. 1984)). The Court must "not weigh the evidence, pass on the credibility of the witnesses, or substitute [its] conclusions for those of the jury." *Zisumbo v. Ogden Reg'l Med. Ctr.*, No. 13-4179, 2015 WL 5172860, at *7 (10th Cir. Sept. 4, 2015) (citation omitted).

"Judgment as a matter of law is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Id.* (citation omitted). In short, a Court may grant a motion for judgment as a matter of law only if no reasonable jury could arrive at a contrary verdict. *Id.* (quoting *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir. 1996)).

## II. Willful Violations Under the Fair Labor Standards Act

In general, the FLSA imposes a two-year statute of limitations on actions for unpaid minimum wages, overtime compensation, or liquidated damages. 29 U.S.C. § 255. Where a defendant's violations are willful, however, a three-year period applies. *Id.* A violation is willful where "the employer either knew or showed reckless disregard for the matter of whether its conduct violated the statute." *Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266, 1270 (10th Cir. 2011) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). A plaintiff can show reckless disregard through "action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* (quoting *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 68 (2007)).

## III. The Willfulness of the Defendants' Fair Labor Standards Act Violations

The Court is unaware of any Tenth Circuit precedent directly addressing whether the falsification of payroll records as a matter of law meets the definition of "willfulness" under the FLSA. The Secretary points to *Donovan v. Pointon*, 717 F.2d 1320, 1323 (10th Cir. 1983), in which the Tenth Circuit affirmed a finding of willful violation of the FLSA in part because the employer in question kept business records that made it appear that he paid his employees in compliance with the Act:

> Where the employer knows [the FLSA exists and could apply to his employees] . . . and marches forward with apparent disregard, his acts are deemed to be

> "willful." Further, in the instant case, it is undisputed [the employer] so kept his business records as to indicate that he was paying overtime in accordance with the Act, when, in fact, he was not.

*Id.* *Pointon* leaves unclear whether the falsified records on their own would have shown the employer's actions to be willful. More important, *Pointon* employed a willfulness standard that the Supreme Court has since rejected. *Compare Pointon*, 717 F.2d at 1323 (10th Cir. 1983) ("It is sufficient to show that the employer knew the Act was 'in the picture' so that he is aware of the Act's possible application to his employees.") *with McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132-33 (1988) ("[A] standard that merely requires that an employer knew that the FLSA 'was in the picture' . . . virtually obliterates any distinction between willful and nonwillful violations."). Following the Supreme Court's decision in *McLaughlin*, *Pointon* does not conclusively require a finding of willfulness here.

Still, the defendants' actions here without doubt meet the higher standard set out in *McLaughlin* and applied by the Tenth Circuit in *Mumby*. Falsifying records demonstrates more than negligence, which does not qualify as willfulness under *McLaughlin*, and more even than reckless disregard, which does. It demonstrates knowledge. The defendants could have only one reason for creating two sets of business records—one set that ostensibly records compliance with the law and that is handed over in the case of a government investigation, and another set that records the defendants' actual, illegal practice. After more than a decade of owning restaurants in the United States, Aguirre knew the law required him to pay his employees minimum wage and overtime, and he hired an accountant to help make it look like he did. At trial, the evidence before the jury pointed but one way: the defendants knew they were breaking the law and took steps to cover it up. Accordingly, the defendants' violations more than meet the standard for willfulness under the FLSA.[12]

11

In so holding, the Court joins a number of district courts that have issued similar rulings after *McLaughlin*. *See, e.g.*, *Yu Y. Ho v. Sim Enterprises, Inc.*, No. 11 CIV. 2855 PKC, 2014 WL 1998237, at *13 (S.D.N.Y. May 14, 2014) (finding FLSA violations willful where employer instructed employees to enter inaccurate hours); *Solis v. El Matador, Inc.*, No. 08-CV-2237, 2011 WL 1671561, at *5 (C.D. Ill. May 3, 2011) (unreported) (finding FLSA violations willful where defendants' "intentional efforts to conceal . . . noncompliance with the FLSA resulted in false payroll records"); *Solis v. Best Miracle Corp.*, 709 F. Supp. 2d 843, 858 (C.D. Cal. 2010) ("It is also clear that Defendants' actions were willful because they engaged in a deliberate campaign to falsify records.") *aff'd*, 464 F. App'x 649 (9th Cir. 2011); *Cloutier v. City of Phenix City*, 834 F. Supp. 366, 373 (M.D. Ala. 1993) (citing *Pointon*, 717 F.2d at 1323) ("If indeed the City failed to comply with the FLSA and falsified documents in order to make it appear as though it had complied, then the City would be guilty of a willful violation."). Several circuit courts have made analogous rulings. *Murray v. Stuckey's Inc.*, 939 F.2d 614, 621-22 (8th Cir. 1991) (affirming district court's finding of willfulness where defendant "pressured plaintiffs into falsifying hours of work as it pertained to overtime."); *Janik Paving & Const., Inc. v. Brock*, 828 F.2d 84, 88, 94 (2d Cir. 1987) (affirming district court's finding of willfulness under a related act where defendants "falsified their certified payrolls" to conceal overtime violations); *see also Goldberg v. Kickapoo Prairie Broad. Co.*, 288 F.2d 778, 781 (8th Cir. 1961) ("False records known to be false and underpayments made knowingly negate any conclusion that only 'innocent' violations were involved."). Aguirre's admissions regarding his actions during the relevant time period foreclose all conclusions but one: Aguirre willfully violated the FLSA. No reasonable jury could have found otherwise.

To be clear, the jury also heard evidence of Aguirre's actions outside of the relevant time period. In particular, the jury heard competing accounts of the defendants' use of the Casio time registers, which beginning in 2012 El Tequila employees used to clock in and out. Before trial, the Court was concerned that evidence related to the Casio registers would confuse the jury and that this danger outweighed its minimal relevance. (Doc. 269; *see also* Doc. 277 at 10-11, 24-31, 43). The evidence was of minimal relevance because the defendants did not start using the Casio registers until 2012—more than a year after the relevant time period ended—and posed a danger of confusion as evidence of the defendants' willful manipulation of Casio time records filled stacks of binders and was fairly complicated to understand. At the behest of both parties, however, the Court allowed the presentation of evidence regarding the Casio registers. (*Id.*).

This evidence was of conditional relevance. In the absence of evidence of the defendants' willfulness during the relevant period itself, evidence outside of that time period could support an inference that the defendants did or did not act willfully during the relevant period. But because the Secretary demonstrated that the defendants' violations during the relevant time period were willful, the willfulness of later violations became irrelevant. It simply does not matter whether the defendants later downgraded their violations from willful to negligent.

Unfortunately, the way the trial unfolded made the Casio records appear not only relevant but, as the defendants were wont to insist, central. Each side thought they had the better argument with respect to the Casio material, and their advocacy no doubt contributed to a false sense of its centrality. In spite of the time and energy the parties focused on it, however, Aguirre's admissions made this evidence—indeed, most of the evidence heard at trial—superfluous and no more than confusing. One cannot know with any certainty what led to the

13

jury's decision. What is clear, however, is that as deliberations drifted into Friday evening, the jury reached a verdict wholly unsupported by the evidence before it. No reasonable jury could have decided as it did.

## CONCLUSION

The jury was asked to answer a single question: "During the period of October 22, 2009 through October 21, 2010, was Defendants El Tequila, LLC and Carlos Aguirre's failure to comply with the requirements of the Fair Labor Standards Act 'willful?'" (Doc. 296). The jury heard little direct evidence regarding the defendants' violations between October 22, 2009, and October 21, 2010—the relevant time period in this case. The evidence they did hear regarding this period, however, points but one way and is susceptible to no reasonable inferences supporting a verdict for the defendants. In the face of defendant Carlos Aguirre's many admissions, no reasonable jury could have found that the defendants did not willfully violate the Fair Labor Standards Act during the relevant time period. Accordingly, the Court grants the Secretary's Renewed Motion for Judgment as a Matter of law.

**IT IS THEREFORE ORDERED** that the Secretary's Renewed Motion for Judgment as a Matter of Law (Doc. 297) is **granted**. The Court will enter a separate judgment terminating the case.

**SO ORDERED** this 22nd day of December, 2015.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE

---

[1] Aguirre speaks English well but imperfectly. At times he struggles to understand and to make himself understood. This difficulty played a role in the Court's Summary Judgment Order, (*see* Doc. 233 at 7, 17), and after Aguirre's first day of trial testimony the Court found it necessary to provide Aguirre with an interpreter, (Doc. 304 at 298:5-23; 322:5-21). Defense counsel, concerned that the interposition of an interpreter would prejudice Aguirre, objected to the Court's decision. (Doc. 304 at 298:25 – 300:14). So strong was defense counsel's objection that he sought to sabotage the Court's order by independently contacting the court interpreter and misinforming him that his services would not be needed the following day. (Doc. 305 at 475:24 – 479:4). The scheduling conflict this deceit created was resolved at the last moment and the interpreter made himself available to interpret for Aguirre. Defense counsel denied the court interpreter's version of events, which he admitted did not put him "in a very good light." (*Id.*).

[2] By accepting these kickbacks Aguirre violated both the settlement agreement he had entered into with the DOL (*see* Doc. 194-13) and the FLSA (Doc. 233 at 21 (citing *Marshall v. Quik-Trip Corp.*, 672 F.2d 801, 807 (10th Cir. 1982) ("[T]he employer's obligation under a consent decree to pay back wages [has not] been extinguished where the employee voluntarily repays part or all of the sum to the employer. . . . The policies of the Act would be nullified if the employer were permitted to retain sums which were refused or went unclaimed."))).

[3] A finding of willfulness under the FLSA extends the statute of limitations by one year, and here would increase the damages owed by the defendants from around $1.7 million to around $2.1 million. (*See* Doc. 238). At the pretrial conference, the Court granted the Secretary's motion to exclude these numbers at trial as irrelevant and overly prejudicial. (Doc. 277 at 32:17 – 36:1; Doc. 269). In spite of this ruling, the defendants submitted proposed jury instructions highlighting the numbers. (Doc. 271). The Court reprimanded the defendants at trial, before the jury entered, and reiterated that the jury would not hear the amount of damages at issue. The next day the defendants' four restaurants were closed and the defendants' employees were bussed to the courthouse, which they picketed. News coverage reveals that many of the signs the employees carried focused on the "millions" owed. (*See, e.g.*, Doc. 293-2). The Secretary represented that an unnamed employee informed the DOL that employees were ordered to picket. (*See generally* Doc. 303 at 290:15 – 294:25; Doc. 304 at 302:2 – 308:20; 320:5-12). The Secretary's evidence that Aguirre orchestrated or even had knowledge of the protest, however, was no more than circumstantial. Aguirre, and his counsel, denied any knowledge of the protest, or even of the fact that Aguirre's restaurants had closed. (Doc. 303 at 292:9 – 294:25; Doc. 304 at 313:21 – 318:11).

[4] The lack of evidence the defendants ultimately presented at trial was startling. This was so not because the defendants could not prevail with testimony alone or by disputing the evidence put on by the Secretary but because leading up to trial the defendants consistently asserted the strength and bulk of their purported documentary evidence. The defendants appeared at the pretrial conference representing that they sought to enter at trial 116 exhibits comprising more than 16,000 pages of documents. (Doc. 277 at 12:18 – 13:21). In partial compliance with the Court's direction, (*id.* at 13:21-25), the defendants reduced these exhibits to around 10,000 pages, (Doc. 279 at 10-19). The Secretary continued to object to the number of documents, as the majority of the documents were cumulative and clearly irrelevant. (*Id.*). Their designation

seemed intended only to mire the Secretary in paper and obscure the defendants' trial strategy. As the defendants refused to comply fully with the Court's orders, the Court was forced to cull around half of the defendants' exhibits itself. Nevertheless, the stack of boxes behind the defendants at trial remained enormous. In spite of the amount of time the parties and the Court put into reviewing the contents of these boxes and determining how many documents would be admitted at trial, in the end the defendants submitted *three* exhibits. (Doc. 293). Two of these exhibits were one- to two-page emails, one of which was stricken. (*Id.*). The two exhibits the defendants ultimately put before the jury provided no material evidence which would in any sense controvert the willfulness of the defendants' FLSA violations during the relevant period.

[5] Regarding the set salary, Aguirre testified, in part, as follows:
    A.    [BY AGUIRRE] Let me explain to you. In that time, before, you know, we get the Department of Labor that—if they work 30, 40 hours—anyway if you have the payroll sheet that shows 30 hours, anyway they get the same pay because that was like a salary because they get one check and the rest they are getting cash. That's why if you—for one of those employees they show 25 hours, he still get the same pay $650.
           If you—for another guy showed like 40 hours, he'll get the same salary paid, $650 if he was a waiter.
(Doc. 303 at 252:17-25).

[6] Victor Kubli, the defendants' accountant, confirmed that Aguirre set the rate of pay, significantly at precisely the minimum wage:
    A.    [BY KUBLI] Well, [employee's] regular rate of pay is 7.25 an hour.
    Q.    [BY THE SECRETARY] Who set that rate of pay?
    A.    Carlos [Aguirre].
    . . .
    Q.    Who set [the overtime] rate of pay?
    A.    Carlos.
    Q.    As an accountant, do you ever set the rate of pay?
    A.    No.
(Doc. 304 at 374:10-23).

[7] The Court adopts the parties' use of the term "middle sheet" to designate the fabricated timesheets Aguirre sent to Kubli both before and after the implementation of the Casio registers. In each case, Kubli never received the original time records these middle sheets purported to summarize.

Although Aguirre's admissions alone are sufficient basis for the Court's ruling, it bears mentioning that Kubli's testimony confirmed Aguirre's admissions persuasively and at length. For example:
    Q.    [BY THE SECRETARY] Did you ever receive any documents as part of the payroll process that showed when employees clocked in and out?
    A.    [BY KUBLI] No.
(Doc. 304 at 376:25 – 377:2).
    Q.    [BY THE SECRETARY] . . . The payroll summary, who creates this document?

> A. [BY KUBLI] I do.
> Q. What is this document based on?
> A. It's based on the middle sheet.

(*Id.* at 378:5-9).

> Q. [BY THE SECRETARY] Okay. From 2002 when you became [the defendants' accountant] through June 30, 2014, is the only style of document you would receive is [sic] one that would show something with total hours?
> A. [BY KUBLI] Yes, it's similar to that, yes.
> Q. Did you ever receive the document in which this middle sheet . . . was based on?
> A. No.
> Q. Okay. How do you know that the information in this middle document with regard to employees' hours is actually correct?
> A. I don't.
> Q. Whose responsibility is it to make sure the hours on these sheets are actually correct?
> A. El Tequila. . . . [and] Carlos [Aguirre], yeah.

(*Id.* 377:13 – 378:4). Kubli further testified that he did not learn that Aguirre paid employees partially in cash until Aguirre was deposed in May 2014. (*Id.* at 379:22-25).

Although not relevant to the Court's decision here (*see infra* p. 13), Aguirre's use of Kubli as a façade to conceal his actual, illegal pay practices continued both after Aguirre's 2011 settlement agreement with the DOL—"Q. Did the payroll process change in any manner [as a result of the Harvard Settlement]? A. [BY KUBLI] No." (Doc. 304 at 375:19 – 376:7)—and later after the defendants' 2012 implementation of the Casio registers:

> Q. [BY THE SECRETARY] Did you receive the Casio sheet as part of your payroll?
> A. [BY KUBLI] No.
> . . .
> Q. Okay. And in all but one instance, the payroll chart [*i.e.*, the middle sheet] had less hours than the Casio report, didn't it?
> A. Yes.
> . . .
> Q. . . . Who is responsible for those hours being shorted?
> A. Carlos [Aguirre].
> Q. Okay. Why is that?
> A. Because they're not on the sheet I have.

(*Id.* at 382:4 – 385:7).

---

[8] Aguirre's verbal hairsplitting on this point appears elsewhere in his testimony:

> Q. [BY THE SECRETARY] . . . You told Investigator Saint-Hilaire that the hours listed on these types of sheets were not accurate; correct?
> A. [BY AGUIRRE] Yeah, they was not precise.
> Q. And you understand when something is not precise, it's not accurate, do you understand that?

17

>       A.      Yeah, that's fine.
>       Q.      Do you understand?
>       A.      Yes.

(Doc. 303 at 262:22 – 263:5). This semantic fixation likely results from the Court's own insistence on precision in its Summary Judgment Order. (*See* Doc. 233 at 9 ("In other words, Aguirre's [deposition] testimony can be read to indicate, as the defendants argue, *imprecise* records that round or approximate, as opposed to intentionally fabricated records.") (emphasis added)). Aguirre's trial testimony put to rest any doubts about the inaccuracy—indeed, the intentional manipulation—of his payroll records.

[9] That the recorded hours so precisely hit but never exceed the 40-hour mark is, of course, one more piece of evidence demonstrating that Aguirre knew what the FLSA required of him.

[10] Undisputed testimony at trial showed indisputably that, at least by the time Saint-Hilaire conducted the first Harvard investigation (*i.e.*, just after the relevant period), Aguirre knew that his practices violated the FLSA. When Saint-Hilaire toured Aguirre's restaurant as part of the investigation, she noted a conspicuously displayed Fair Labor Standards Act poster. (Doc. 302 at 49:15 – 51:7). This poster demonstrated twice over Aguirre's knowledge of the FLSA's requirements. First, the poster, designed to inform employees of their rights under the FLSA, listed the federal minimum wage and overtime. Second, the FLSA's recordkeeping regulations required covered employers to conspicuously display the poster. 29 C.F.R. § 516.4. In short, Aguirre would have seen, on a daily basis, a poster designed to inform readers of the very provisions he was intentionally violating, and by displaying the poster in the first place he revealed his knowledge of and familiarity with not just the FLSA but the regulations implementing it.

[11] Aguirre admitted that these payroll sheets included sheets from January 23, 2010, and July 10, 2010—*i.e.*, payroll sheets within the relevant period. (Doc. 303 at 252:4 – 254:19). It is no coincidence, of course, that the hourly wage recorded on the payroll sheets, but which Aguirre's employees were not actually receiving, precisely coincides with the legally mandated minimum wage.

[12] Among the defendants' more fanciful arguments is the claim that Aguirre could not have willfully violated the FLSA because he "testified he relied on his CPA [Victor Kubli] in preparing the payroll." (Doc. 300 at 9). He also testified that he hid from Kubli the hours his employees actually worked. (Doc. 303 at 261:10-18). As a result Kubli did not know that the payroll records he was preparing were fraudulent. (*See, e.g.*, Doc. 304 at 377:10-22 ("Q. How do you know that the [only] information [Aguirre gave you] . . . with regard to employees' hours is actually correct? A. [BY KUBLI] I don't.")).

This supposed defense is risible, and the manner of the defendants' use of their accountant is further evidence of Aguirre's guile, rather than his perplexed innocence.